Woodall, d/b/a W. P. Woodall Company, Appellant, vs. Democrat Printing Company, Respondent.

*February 28—May 13, 1947.*

For the appellant there were briefs by *Hill, Beckwith & Harrington* of Madison, and oral argument by *D. V. W. Beckwith.*

For the respondent there was a brief by *Spohn, Ross, Stevens & Lamb* of Madison, and oral argument by *Frank A. Ross.*

FOWLER, J. The complaint alleges nine causes of action each to recover $250 damages for one of several successive alleged breaches by defendant of a contract made by it with the plaintiff for a single use of a mailing list furnished by plaintiff to defendant for mailing out to persons on the list a booklet printed by defendant containing advertising matter. One Louis Galter got up the booklet which he called "War Plant Bulletin." It was designed to be mailed by him at intervals to persons engaged in metal-working industries who might desire the articles described in the Bulletin. Galter applied to the plaintiff, who compiled and furnished mailing lists, to furnish him with a list of names of such persons with their addresses to whom the Bulletin might be mailed for advertising purposes. While some correspondence preceded it, the first contact between Galter and Woodall relating to furnishing a list of names was a telephone conversation in which Galter told Woodall that what he wanted was to get 25,000 names, four sets of labels, one original and three sets of carbons. Woodall told him that would constitute an outright purchase. After this talk

Woodall sent a telegram offering to supply 25,000 names typed on gummed labels and three carbons at a total cost of $1,250. In reply to the telegram Galter wrote a letter in effect saying that the price was too high and asking him to refigure the cost, saying that if the price could be put between $500 and $600 he, Galter, thought he could send an order. This letter closed with the statement that "we will never resell a copy of your list." Woodall sent a long letter in reply, that resulted in another telephone talk between Woodall and Galter. Woodall asked Galter how he proposed to pay and how he was to assure "that the names would not be pirated." Galter replied that the Democrat Printing Company and the head of that company, Mr. Brandenburg, were backing the enterprise and said they would issue the orders to plaintiff and pay the bills. Woodall told Galter that if the Democrat Printing Company and Brandenburg would issue the order and would give "absolute assurance" in writing that the list would not be pirated or used for any other purpose than one mailing he, Woodall, would "go ahead." Following this talk Woodall received a letter from the defendant which is quite specific and embodies the contract for the first gummed list and copies. This letter included this provision: "This is our assurance that we will not sell or copy these labels, nor use them for any other purpose than mailing the first issue of War Plant Bulletins." It fixed the total number of labels at 25,000 and the price at $10 per thousand "or $250 for this order." Woodall by letter to Brandenburg objected to one provision of Brandenburg's order, but after talking with Galter, Woodall sent a letter to Brandenburg saying Galter had straightened out the matter to which he, Woodall, had objected and Woodall was proceeding with the work of furnishing the list. Following this the first batch of labels was sent to the defendant and only proper use of it was made by the defendant, and the $250 cost was paid by defendant direct to Woodall.

At the conclusion of this contract not only the plaintiff and Galter, but the defendant, contemplated the furnishing of lists by the plaintiff for subsequent mailings of the Bulletin. This is evidenced by the following statement in a letter by Brandenburg to Woodall concluding: "We want to work with you in a mutually helpful way and to look forward to a long and pleasant association."

The negotiations between the plaintiff and defendant covering the second list of 25,000 names began with a letter from Galter to Woodall saying "it appears we'll need an addressing [list] by November 7—same specifications and quantity as was specified previously." The "same specifications" obviously refers to those in the contract covering the first list. This letter further said: "As previously, you will bill the Democrat Printing Company and ship the completed job to them. . . . A copy of this letter is being sent to Madison. Should you wish to have a confirmation of this order from the Democrat Printing Company, please wire them so no time will be lost in your getting under way to deliver the job on time." In compliance with the statement regarding confirmation, Woodall sent a telegram to Brandenburg saying: "Please air-mail confirmation of order for readdressing list and include same assurance as last time that names will not be copied." To this the defendant answered by letter: "Please furnish by post 25M addressed labels per detailed order of Mr. Galter. This is merely confirmation and guarantee of payment as I don't know details of your deal [with Galter]—presumably same in all respects as last order." Pursuant thereto 25,000 names were sent and billed to defendant and paid for by defendant direct to plaintiff. This completed the contract between the parties respecting the second 25,000 list.

By the contract so made the plaintiff was to deliver to defendant a gummed list containing names of persons with proper addresses. The defendant was to cut the names with accom-

panying addresses from the list and attach them to the publication before mailing. The use made by the defendant was by the contract restricted solely to such single use. Pursuant to this contract the plaintiff sent to defendant a second gummed list. After receiving the second gummed list the defendant let Galter take it with him to Chicago and keep it there ten days, ostensibly to deduct from it names of persons from whom the publication first sent had been returned to him as not delivered. No subsequent lists were ordered by defendant from the plaintiff. All subsequent mailings by the defendant were made from lists furnished by Galter, practically all as the trial court found copied by Galter from the second gummed list, which defendant had let Galter take to delete names as above stated. The first cause of action and each subsequent cause of action for $250 was based on the third and subsequent mailings of the Bulletin by defendant from a list sent defendant by Galter.

The court found that the number of mailings made by the defendant subsequent to the second was nineteen; held that the third mailing by defendant and each subsequent mailing constituted a breach of the contract between plaintiff and defendant made for furnishing the second gummed list; held that this third mailing constituted a conversion by the defendant of the second gummed list; that the list was worth $1,250 and that plaintiff was entitled to recover that sum less the cost to plaintiff of making and sending the list to defendant; and held that the defendant was entitled to apply the $250 paid by it to plaintiff for the second gummed list and so applied it and gave plaintiff judgment for $1,000 less such cost and interest on the differences as damages.

The plaintiff contends that upon the court's theory of breach of contract and conversion of the list the $250 paid for the second list was improperly applied and that the true measure of damages was $250 for each of the successive breaches of the contract less the expense the plaintiff would have been put to

had he furnished a gummed list to the defendant to be used in mailing out the subsequent Bulletins.

The defendant contends, under a motion to review, that the trial court erred in holding the defendant's use of the second list furnished it by the plaintiff violated his contract and that the complaint should have been dismissed; but that if the court was right in holding that the defendant violated his contract the measure of damages applied by the court was correct and the judgment should be affirmed.

The questions for determination thus are: Did the trial court correctly determine that, (1) the use of the second list furnished by plaintiff to defendant was so restricted by the contract between the parties to it as was the first? If so, (2) Did letting Galter take the second gummed list for the purpose of correction constitute a breach of the second contract? and if so, (3) Did letting Galter take the list in view of his copying it and furnishing from the copy the subsequent mailing lists to defendant impose liability on the defendant for its value? and if so (4) Did the court properly allow the $250 credit for payment by defendant to plaintiff for the second list? or (5) as *contra* to (2), (3), and (4) above, Is plaintiff entitled to damages for each of the successive mailings of the publication after the first?

The trial court concluded that the contract for the second list was in all respects like the first and that the use to be made of it by the defendant was limited to a single mailing. These conclusions were based on the judge's determination of the sense in which certain words, particularly "we" and "use," were used in the defendant's letter to the plaintiff relating to the first contract. While the construction of a contract, when it is not ambiguous, is a matter of law for the court to determine, when there is ambiguity the sense in which words therein are used is a question of fact. *Becker v. Holm,* 89 Wis. 86, 61 N. W. 307; *French v. Fidelity & Casualty Co.* 135 Wis. 259,

115 N. W. 869, 17 L. R. A. (N .S.) 1011; *Kipp v. Laun*, 146 Wis. 591, 604, 131 N. W. 418. Brandenburg's letter respecting this contract was in reply to Galter's statement to Woodall that Brandenburg would "give absolute assurance in writing that the list would not be pirated or used for any other purpose than one mailing." The language in Brandenburg's letter, and in the contract that letter evidences, was Brandenburg's own, and if subject to two meanings is to be construed in favor of Woodall if subject to the meaning that Woodall understood it to mean. Woodall reasonably considered that the words "we" and "use" meant that neither the defendant nor Galter would copy the list or use it for anything but the single mailing. Moreover the second order was sent by Galter by letter at Brandenburg's suggestion. It contains the clause "it appears we'll need an addressing list," etc. The "we" in "we'll need" manifestly covers both Galter and the defendant. If it referred to Galter only the phrase would have been "I'll need." A copy of this letter was sent Brandenburg so he knew "we" in that letter included Galter, and this adds support to the inference that the "we" in Brandenburg's letter to Woodall closing the first contract included him. Even if the word "we" be taken as referring to Brandenburg and the defendant company or the defendant company in a collective sense, it still leaves the word "use" subject to the meaning that it would not be loaned, or let go out of the defendant's own possession. A copy of Galter's letter to Woodall ordering the second list was sent by Woodall to Brandenburg.

Respondent contends that its letter relating to the second order is merely a guaranty of payment. This construction is not tenable. It is both a confirmation and a guaranty of payment. Confirmation necessarily implies confirmation of the first contract and is in response of the letter of Woodall to Brandenburg which says "Please air-mail confirmation of order . . . and include same assurance as last time that names will not be copied." The letter of Brandenburg is therefore an admission that the first contract guaranteed that the names

would not be copied and a guaranty that the second list would not be copied by the defendant or Galter. Moreover, the meaning of "assurance" in the letter of Brandenburg, relating to the first contract, was a question of fact under the cases above cited.

Under the construction of the contract covering the second list made by the trial court, with which we agree, it is plain that letting Galter take the second list was a breach of the second contract, and the only question left for determination is whether the trial court applied the correct measure of damages. We think it did. The contention of defendant that it did perhaps renders it unnecessary to consider the merits of that question. However, so considering it, we think that the damages cannot exceed the value put by the plaintiff on what he designated the value on "an outright sale" of the list. The defendant's liability for the copying of the list could not exceed Galter's, and Galter's liability for pirating the list could not be greater than it would have been had he purchased it. Also as to the application of the $250 the defendant paid for the second list, having paid $250 for a restricted use of the list, on becoming liable for an unlimited use of it the defendant might rightly apply the amount on the value of an unrestricted use. It follows that the judgment should be affirmed.

*By the Court.*—The judgment of the circuit court is affirmed.

ROSENBERRY, C. J. (*dissenting*). With all due respect, to my mind the evidence in this case presents a substantially different picture than that disclosed by the statement of facts in the opinion of the court. For that reason, it is necessary for me to set out the facts as they appear to me as a basis of my dissent.

Galter was the publisher of a trade journal known as the "War Plant Bulletin." He entered into negotiations with the defendant to print and mail the booklet. The defendant investigated and found that Galter had no credit standing and

for that reason declined to enter into a contract with him. Galter had a large number of contracts with advertisers whose advertisements were published in the booklet. The defendant suggested to Galter that if he would assign these contracts to the defendant so as to secure payment of the cost of the publication and mailing, the defendant would enter into an arrangement with him. Galter accepted this condition, made assignments of the advertisers' contracts, nearly all of which were executed by the advertisers and delivered to the defendant. The arrangement was verbal and in substance was as follows: Galter's customers were to pay their advertising in the War Plant Bulletin directly to the defendant; out of this the defendant was to pay the expenses of printing and any expense it may have incurred in connection with the printing and mailing of the booklet, and pay the remainder to Galter. As the execution of the project proceeded, it became necessary for Galter to furnish a list of firms and persons to whom he wished the booklet mailed. The material part of the negotiations which were carried on by letter and telephone follows:

Sept. 3, '42—Galter wrote Woodall inquiring about list of addresses.

Sept. 9, '42—Woodall wrote Galter at his Chicago office at length in regard to furnishing a list.

Sept. 10, '42—The plaintiff wired Galter as follows:

"Will supply 25,000 metal working plants and machine shops, about 20,000 personalized with name of one man per plant, balance company address only, typed on gummed labels 24 to 33 per sheets, original and 3 carbons each name at total cost of $1,250. Can complete in 4 working days after receipt of order."

— On the same day, he wrote Galter a lengthy letter in regard to the labels.

Sept. 10, '42—Galter wrote Woodall a letter in regard to the labels to be furnished, in which he said:

"I wish to make it perfectly clear that we will never resell a copy of your list. Also, our use of your list and our crediting you as a source of it, should very readily create business for you among our many clients."

Sept. 11, '42—Woodall wrote Galter in reply to Galter's letter of the 10th. A phone conversation followed between Galter and the plaintiff, the date of which is not given.

In the meantime, the plaintiff had investigated Galter's financial standing, which he found unsatisfactory, and in the course of the conversation, asked Galter how he proposed to pay for the service and how he was to assure him that the names would not be pirated. Galter told the plaintiff that the Democrat Printing Company of Madison, Wisconsin, and the head of that company, Mr. Brandenburg, were personally backing his enterprise; that they would not only issue the orders to plaintiff and pay Galter's bills.

Galter told plaintiff they were also advancing money to him for the conduct of his business, and that he, Galter, had that arrangement with Brandenburg. There was no such arrangement as Galter represented and the defendant knew nothing of Galter's representations to the plaintiff.

Plaintiff then told Galter that if the Democrat Printing Company and Mr. Brandenburg would issue the orders and give him absolute assurance that the labels would not be pirated or used for any other purpose than the one mailing and stated that the assurance must be in writing and in those words, he would be glad to go ahead. Galter communicated this to the defendant.

Sept. 14, '42—The defendant wrote Woodall as follows:

"This will confirm Mr. Galter's order to you over the phone today, with the following understanding:

"1. Total labels; 25,000. These are to be on 8½ x 11 gummed paper, '24 on,' the price being $10 per M, or $250 for this order.

"2. These are to include you, entire 23,000 list which we understand you can personalize on all but some 4,000 machine shops. The name of the top production executive below the name and address of the firm after one space is skipped to read, Att. Mr. John Doe (position).

"3. To make up 2,000 names between your 23,000 list and our need for 25,000 you are to allocate multiple copies to the various top executives among large companies.

"4. All of the names on this list will be separated geographically.

"5. You are to have the job completed a week from today, September 21st, and shipped to us on that date by air express. You will ship as much as is completed by express before then.

"6. This is our assurance that we will not sell or copy these labels, nor use them for any other purpose than mailing the first issue of War Plant Bulletins.

"Mr. Galter anticipates conferring with you in New York or Chicago within thirty days regarding a mutually satisfactory arrangement for subsequent addressings."

Sept. 15, '42—Upon receipt of this letter, the plaintiff wired the defendant as follows:

"Cannot comply specification two your letter at price or time stated. Regular method of addressing is system we employ except no title will be listed. Advise."

Following this telegram Galter called the plaintiff on the telephone. In the course of the telephone conversation some details were discussed.

Sept. 16, '42—Plaintiff wrote the defendant air mail, special delivery, as follows:

"Mr. Galter just telephoned me from Chicago, and all questions have been straightened

out so that we are again able to proceed with the work.

"He has also asked us to ship anything that we have ready this week end to you, and follow with the balance of the job at the earliest possible date.

"The list arrangements for this first mailing have been rushed and, consequently, there was some difficulty in getting a thorough understanding of your requirements and matching them with what we could do in the time allotted. I see no reason at all why a mutually satisfactory arrangement for regular mailing cannot be worked out just as soon as Mr. Galter and I are able to get together."

A copy of this letter was sent to Galter.

Sept. 17, '42—The defendant wrote the plaintiff as follows:

"When I received your wire yesterday I phoned Mr. Galter in Chicago because I wasn't too conversant with the arrangements you and he had made. He then called you; and your letter, just at hand, indicates that all difficulties have been ironed out.

"The 'specifications' which appeared over my signature were of Galter's dictation. Neither of us understand all the intricacies of your mechanical problems in addressing; and I assure you we were not trying to make your task difficult or expensive. We want to work with you in a mutually helpful way and to look forward to a long and pleasant association."

Sept. 19, '42—The plaintiff wrote Galter as follows:

"This is to let you know that we are shipping today by air express 4,050 addressed labels to Mr. Brandenburg at the Democrat Printing Company.

"These labels are arranged geographically and are in three lots."

A carbon copy of this letter was sent to Brandenburg.

Sept. 22, '42—The plaintiff wrote Galter as follows:

"We are shipping by air express tonight two lots of addressed labels, to Mr. Brandenburg at Madison, Wis. These are arranged geographically and total 10,700."

A carbon copy was sent to Brandenburg.

Sept. 23, '42—Letter from plaintiff to defendant:

"Thank you for your very cordial letter of the 17th. I, too, feel that there is every reason why we should have a mutually satisfactory, pleasant and long-term association and I now feel that this is a distinct possibility."

Remainder of letter not material.

Sept. 25, '42—Plaintiff wrote Galter as follows:

"We are inclosing an invoice covering the addressing on gummed white labels of names selected in accordance with your instructions. The addressed labels were all shipped to Mr. Brandenburg by air express.

"We shall look forward to hearing from you regarding the results of this mailing."

Sept. 30, '42—Letter of Galter to plaintiff (not material).

Oct. 3, '42—Plaintiff answered Galter's letter (not material).

Oct. 9, '42—Galter writes Woodall in regard to the bill.

Oct. 15, '42—Plaintiff again wrote Galter (not material).

Above letters relate to negotiations between plaintiff and Galter as to order for second lot.

Oct. 28, '42—Galter wrote the plaintiff as follows:

"I just talked with Mr. Brandenburg on long distance to place the order with you, but he suggested that I rush the order to you since he was less familiar with the whole matter than I am. As previously, you will bill the Democrat Printing Company and ship the completed job to them at Madison, Wisconsin via air express. A copy of this letter is being sent to Madison. Should you wish to have a confirmation of this order from the Democrat Printing Company, please wire them so no time will be lost in your getting under way to deliver the job on time.

"If you should be unable to complete the job in the time specified please wire me here without delay indicating your next best delivery date so we can make our plans accordingly.

"I had expected to be in New York by now and would have been were it not for my illness. However, I'll definitely be there on November 9th, at which time I expect to see you."

Oct. 29, '42—Plaintiff wrote Galter:

"Yes, we can complete the job for you on time. As a matter of fact, most of the labels have already been addressed and I expect to ship them early next week. I figured you would want another run of them, and the opportunity presented itself to do some typing while waiting for material on other jobs.

"Attached is a copy of a wire I have sent to Mr. Brandenburg requesting confirmation of the order and agreement that the names will not be copied nor used for any other purpose than this one mailing.

"I look forward to seeing you on November 9th and will schedule my time so as to spend as much of the day with you as may be needed."

Carbon copy to Brandenburg.

— Telegram from plaintiff to Brandenburg read as follows:

"Please air-mail confirmation of order for readdressing list and include same assurance as last time that names will not be copied."

Oct. 29, '42—Defendant to plaintiff:

"Please furnish by post 25M addressed labels per detailed order of Mr. Galter. This is merely confirmation and guarantee of payment as I don't know details of your deal—presumably same in all respects as last order."

Nov. 6, '42—Plaintiff to defendant:

"We are inclosing an invoice for the 25,000 gummed white labels addressed in accordance with instructions from Mr. Galter, of War

Plant Bulletins, and covered by your order No. 2853."

— On the same day, plaintiff wrote Brandenburg: "This is to let you know that we have shipped another set of 25,000 addressed labels to you. These were sent by air express and left here yesterday."

There is little if any conflict in the evidence relating to the integration of the contract between the plaintiff and defendant. A consideration of the facts makes it obvious that the determination of the rights of the parties depends very largely upon the construction of paragraph 6 in the letter written by the defendant to the plaintiff on September 14th. This paragraph is as follows:

"This is our assurance that we will not sell or copy these labels, nor use them for any other purpose than mailing the first issue of War Plant Bulletins."

In my opinion, the meaning of the word "we," as used in this paragraph, must be determined from what immediately preceded it. The plaintiff had investigated Galter's financial standing, which he found to be unsatisfactory. In the course of a telephone conversation between the plaintiff and Galter, the plaintiff asked Galter how he proposed to pay for the service and how he (Galter) was to assure him that the names would not be pirated. In response, Galter told the plaintiff that the Democrat Printing Company of Madison, Wisconsin, and the head of that company, Mr. Brandenburg, were personally backing his enterprise; that they would not only issue the orders to the plaintiff and pay Galter's bills, Galter also told the plaintiff they were advancing money to him for the conduct of his business and that he, Galter, had that arrangement with Brandenburg. There is no evidence of any such arrangement, and the defendant knew nothing of Galter's representations to the plaintiff. There is no evidence that Galter

at any time, or Woodall until after the commencement of this action, made these representations known to the defendant.

The plaintiff then told Galter that if the Democrat Printing Company and Mr. Brandenburg would issue the orders and—

"will give me absolute assurance that the list will not be pirated or used for any other purpose than the one mailing and will make this statement in writing, in those words"—

he would be willing to go ahead. Galter then communicated plaintiff's demand to the defendant, and it was in response to this demand that the defendant wrote the letter of September 14, 1942.

It is manifest that when the defendant used the words "we" and "us" in the letter of September 14th, it was in no way referring to Galter, nor did it give the assurance in the language indicated by the plaintiff. If it had followed that language, paragraph 6 would have read something like this:

This is our assurance that these labels will not be sold or copied nor used for any other purpose than mailing the first issue of War Plant Bulletins.

Instead of using the language indicated by the plaintiff the defendant assured the plaintiff that—

"We will not sell or copy these labels nor use them for any other purpose than mailing the first issue of War Plant Bulletins."

This was a material departure from plaintiff's proposal but the plaintiff was satisfied with it and shipped the labels. To my mind this makes clear that the pronoun "we" used in paragraph 2, and the word "us" used in paragraph 5, and the word "we" used in paragraph 6, refer not to the defendant and Galter but to the defendant alone.

In business correspondence the word "we" is frequently used when an officer or employee is writing for the corpora-

tion to refer not to the writer but to the corporation. Woodall was doing business under the name of W. P. Woodall Company. Throughout his correspondence with Galter and with the defendant, Woodall used the word "we" in its different forms to refer to the W. P. Woodall Company and to himself. In Woodall's letter to Galter of September 11th, he used the pronoun "we" a number of times, referring to himself. In his notice to Galter in regard to shipments he used "we" as referring to the W. P. Woodall Company, and so throughout his correspondence the pronoun "we" is frequently used to refer to either Woodall or his company.

The fact that Woodall's request was phrased as it was, and that it was the assurance of the defendant that he was seeking and not that of Galter because he had found Galter to be financially irresponsible, makes it impossible for me to agree that the word "we" in the letter of September 14th was used by the writer as including the defendant and Galter or that it was so understood by the plaintiff. The plaintiff was asking that the defendant make itself liable. He already had Galter's assurance for what it was worth that he would not sell or copy the list.

On October 15, 1942, the plaintiff wrote Galter as follows:

"Thanks for sending the bill for the last job up to Madison. I find that this was sent to you because they felt it would need your O. K. before going to the Democrat Printing Company. However, in the future bills will be sent direct to them at Madison."

This indicates that the plaintiff knew that the arrangement for the manufacture and shipping of the labels was for Galter and not for the Democrat Printing Company; otherwise he would not have thought that Galter's O. K. was necessary.

We come now to the negotiations for the second order of labels which were carried on between the plaintiff and Galter. After the plaintiff and Galter had reached an agreement and on October 29th, plaintiff wired defendant as follows:

"Please air-mail confirmation of order for readdressing list and include same assurance as last time that names will not be copied."

In response the defendant wired or wrote the plaintiff the communication of October 29th, which is as follows:

"Please furnish by post 25M addressed labels per detailed order of Mr. Galter. This is merely confirmation and guarantee of payment as I don't know details of your deal—presumably same in all respects as last order."

The words "I don't know details of your deal" clearly refer to Galter's deal with the plaintiff for the second instalment of labels and make no reference to the September contract between the plaintiff and defendant. The defendant presumes that the two deals are the same. The assurance given by the defendant and embodied in paragraph 6 of the September 14th letter was an arrangement directly between the plaintiff and defendant and was no part of Galter's first deal with the plaintiff. Galter had no authority to bind the defendant, and the assurance given by the defendant was no part of the deal between the plaintiff and Galter which relates solely to the labels. As a condition of shipping the labels plaintiff demanded assurance from defendant, which it gave.

Even if it should be held that the words "presumably same in all respects as last order," refer to defendant's assurance, it means no more than that the defendant will not sell or copy the labels sent to it nor use them for any other purpose than mailing the current issue of the War Plant Bulletin.

As already pointed out, the word "we" does not include Galter and gives no assurance that there will not be a misuse of the labels by Galter. For some reason the plaintiff did not insist upon having the language which he suggested, that is,—

"absolute assurance that the list will not be pirated or used for any other purpose than the one mailing"—

incorporated in either of the orders confirmed by the defendant. He accepted the assurance given as a sufficient compli-

ance. The defendant is bound not by any manifestation made by Galter to the plaintiff but only by those manifestations which it made to the plaintiff.

The court found that the relation between the defendant and Galter was not that of partnership but that of printer and customer. It is plainly apparent from all the correspondence that the plaintiff never acted upon the assumption that Galter had authority to represent the defendant. When it came to matters other than the negotiations of the orders, the plaintiff relied solely upon the agreements of the defendant made directly with him.

One further matter remains to be considered, which is, Did the defendant violate its agreement with the plaintiff? The trial court found that the agreement of the defendant was not to sell or copy said labels nor to use them for any other purpose than mailing the first issue of War Plant Bulletin, and the first instalment of labels were sold upon the strength of that agreement; that Galter placed a second order with the plaintiff; that thereupon the plaintiff wired the defendant to air-mail confirmation of the order for readdressing list and "include same assurance as last time that names will not be copied," whereupon the defendant responded by letter of October 29, 1942, which is as follows:

"Please furnish by post 25M addressed labels per detailed order of Mr. Galter. This is merely confirmation and guarantee of payment as I don't know details of your deal—presumably same in all respects as last order."

That within a week after the delivery of the second order the defendant permitted Galter to take possession of the labels and take the same to Chicago for the declared purpose of editing the same; that the reason for editing same was that the returns from the first mailing had indicated certain misdirected envelopes and envelopes to deceased persons and the like; that said Galter had possession of said labels in Chicago for several days and thereafter the defendant affixed said labels

furnished by Galter to the magazine and mailed out the second edition. The court held the defendant's permission to let Galter take the labels to Chicago was a breach.

No claim is made that the defendant has ever at any time sold or copied the labels nor used them for any other purpose than mailing the first issue of War Plant Bulletin. The defendant is in no way liable for the acts of Galter unless the sixth paragraph of the letter of September 14th can be interpreted as an assurance that neither the defendant nor Galter would use the labels for any other purpose than the designated purpose. To my mind, the state of the negotiations at the time the defendant wrote the letter of September 14th, in response to Galter's demand that the defendant and Mr. Brandenburg issue the orders and give the assurance that the labels would not be misused and the defendant's response thereto, permit no other construction of paragraph 6 than that the defendant was speaking for itself and not for Galter. In my opinion, therefore, the defendant is not liable for what other use Galter may have made of the labels while he had them in his possession for the purpose of correcting them, which was a perfectly normal and reasonable thing for him to do, and not a breach of defendant's agreement. The labels were the property of Galter, paid for out of his funds, and he alone derived any benefit from their use.

In my opinion, the judgment should be reversed and the complaint dismissed.

I am authorized to state that Mr. Justice FRITZ and Mr. Justice FAIRCHILD concur in this dissent.